IN THE UNITED STATES DISTRICT

FOR THE DISTRICT OF NEW MEXICO

FILED

09 JUN 12 PM 2: 25

CLERK-ALBUQUERQUE

**LARRY NEELY,**

              **Plaintiff,**

    **vs.**                                    CIVIL No. 09cv585 MV/ACT

**DARREN WHITE, in his individual and**               JURY TRIAL DEMANDED
**official capacity as Bernalillo County Sheriff;**

**JOHN DENKO, in his individual and official**
**capacity as Cabinet Secretary for the New Mexico**
**Department of Public Safety;**

**JOE WILLIAMS in his individual and official**
**capacity as Cabinet Secretary for the New Mexico**
**Department of Corrections;**

**DANNY JOSEPH, Detective for Bernalillo**
**County, in his individual capacity;**

**CHEL HECHTER, former New Mexico Department**
**of Corrections employee, in his individual capacity;**

**TROY RODGERS, Contractor for the New Mexico**
**Department of Corrections, and Consultant for the Bernalillo**
**County Sheriff's Department, in his individual capacity,**

**AND OTHER UNKNOWN CO-CONSPIRATORS,**

              **Defendants.**

## COMPLAINT FOR DAMAGES
## AND DEMAND FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Plaintiff brings this *Complaint For Damages And Demand For Declaratory And*

*Injunctive Relief* as a result of conspiratorial actions committed by the named Defendants

and other unknown co-conspirators in violation of 42 U.S.C. § 1983.

1

## NATURE OF ACTION AND JURISDICTION

1.     Pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(3), this Court has original

jurisdiction over Plaintiffs' claims arising under the Constitution and laws of the

United States.

2.     This is an action for damages arising out of violations of 42 U.S.C. §1983, 42

U.S.C.§ 1985, 42 U.S.C. § 1986, 42 U.S.C. § 1988.

## PARTIES

3.     Plaintiff Larry Neely [hereinafter referred to as Mr. Neely] is an individual and

currently resides at 9722 Western Avenue SW, Albuquerque, New Mexico,

87121, located in the County of Bernalillo.

4.     Defendant Darren White is the Sheriff of Bernalillo County.  At all pertinent

times, White was acting in the course and scope of his employment and under

color of state law, and had final supervisory and policy-making authority over the

Bernalillo County Sheriff's Department (BCSD).

5.     Defendant Danny Joseph is a Detective for the Bernalillo County Sheriff's

Department.  At all times, Detective Joseph was acting in the course and scope of

his employment and under color of state law.

6.     John Denko is the Cabinet Secretary of the New Mexico Department of Public

Safety (DPS).  At all pertinent times, Denko was acting in the course and scope of

his employment and under color of state law, and had final supervisory and

policy-making authority over the DPS.

7.     Defendant Chel Hechter was formerly employed by the New Mexico Corrections

Department (NMCD) as the supervisor of the Sex Offender Unit, Region II

Special Programs.  At all pertinent times, Hechter was acting in the course and

scope of his employment and under color of state law.

8.     Defendant Joe Williams is the Cabinet Secretary of the New Mexico Corrections

Department.  At all permanent times, Williams was acting in the course and scope

of his employment, and under color of state law, and had final supervisory and

policy-making authority over the New Mexico Corrections Department.

9.     Defendant Troy Rodgers is the clinical director of Forensic Behavioral Health

Associates (FBHA).  Beginning in March of 2006, under the supervision of Troy

Rodgers, FBHA began providing mental health services pursuant to a contract

with the New Mexico Department of Corrections.  Dr. Rodgers and FBHA's

employees acted under color of state law.

## FACTUAL BACKGROUND

10.    On August 12, 2005, in Lonoke Circuit Court, Mr. Neely was sentenced to five

years' probation for five counts of *Harassing Communications*, and two counts of

*Sexual Indecency With A Child*, contrary to the laws of the state of Arkansas.

11.    The factual basis underlying the plea was a series of phone calls Mr. Neely placed

from Albuquerque to Lonoke, Arkansas in which he spoke to various members of

the Lonoke High School Football team about a variety of subjects, including sex.

12.    At no time did Mr. Neely travel or make plans to travel to Lonoke; at no time did

Mr. Neely meet or offer to meet any of the young men he spoke with; at no time

3

was there any correspondence – electronic or otherwise – attempting to arrange a meeting between Mr. Neely and the young men he spoke with; at no time was there any communication or attempt to communicate through any medium other than the telephone.

13.     At the time of Mr. Neely's plea, he resided at 3015 Mountain Road NW, Space #4, Albuquerque, NM 87104.

14.     In September 2005, responsibility for Mr. Neely's supervision was transferred from Arkansas to New Mexico, pursuant to the Interstate Compact For Adult Offender Supervision (ICAOS).

15.     Mr. Neely's case was assigned to the Sex Offender Unit (SOU), despite the fact that Mr. Neely's offense is not equivalent to any of the offenses requiring sex offender registration in the state of New Mexico.

16.     The SOU is a highly structured supervision program as described by David Jablonski while participating at the American Correctional Association (ACA) 2006 winter conference.  Jablonski stated, "The New Mexico Corrections Department's Probation/Parole Division has developed a new approach to supervise sex offenders."  Jablonski further stated, "Several public and private agencies have come together and formed an intra-agency team to monitor these offenders.  They include: the Probation/Parole Sex Offender Unit, the Bernalillo County Sheriff's Department Sex Offender Unit, clinical staff and a contracted polygraph examiner..."

17. New Mexico Corrections Department officials, in consultation with the Bernalillo County Sheriff's Department and Delores Bainbridge of the New Mexico Department of Public Safety, decided that Mr. Neely's offense was "substantially the same" as *Sexual Exploitation of Children*.

18. These consultations between the Defendants occurred to justify Mr. Neely's assignment to the highly restrictive Sex Offender Unit.

19. Sexual Exploitation of Children is an offense that requires video depictions of children in a lewd and indecent manner. Section § 30-6A-3 NMSA, New Mexico's *Sexual Exploitation of Children* statute states:

A. "It is unlawful for a person to intentionally possess any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person knows or has reason to know that one or more of the participants in that act is a child under eighteen years of age. A person who violates the provisions of this subsection is guilty of a fourth degree felony.

B. "It is unlawful for a person to intentionally distribute any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person knows or has reason to know that one or more of the participants in that act is a child under eighteen years of age. A person who violates the provisions of this subsection is guilty of a third degree felony.

C. "It is unlawful for a person to intentionally cause or permit a child under eighteen years of age to engage in any prohibited sexual act or simulation of such an act if that person knows, has reason to know or intends that the act may be recorded in any obscene visual or print medium or performed publicly. A person who violates the provisions of this subsection is guilty of a third degree felony, unless the child is under the age of thirteen, in which event the person is guilty of a second degree felony."

20.   In spite of Mr. Neely's expressing his disagreement, and for the duration of Mr.
      Neely's supervision, the NMCD's website indicated that Mr. Neely was under
      supervision for both *Harassment* and *Sexual Exploitation of Children*.

21.   This despite the fact that clearly none of the underlying conduct described in the
      investigative documents alleged any of the necessary elements described in the
      offense of *Sexual Exploitation of Children*.

22.   *Sexual Exploitation of Children* is a more serious offense than that for which Mr.
      Neely was convicted in Arkansas, and criminalizes behavior for which Mr. Neely
      was never accused.

23.   On October 21, 2005, Probation and Parole Officer (PPO) Rosalind Hankins
      notified Mr. Neely to report to the probation office for a Global Positioning
      Monitoring (GPS) device to be attached to his person.

24.   David Jablonski of the NMCD, had publicly proclaimed in a television interview
      that the NMCD's policy at that time was that GPS tracking was required for "the
      most violent sexual offenders."

25.   George Drake, then Deputy Director of the NMCD's Probation/Parole Division,
      was interviewed by newspaper reporter T.J. Wilham for a February 9, 2006,
      Albuquerque Journal story regarding GPS monitoring.

26.   Drake stated, "In a way, this is a crime deterrent." Drake went on to say that "…
      they [offenders] are going to have to postpone their criminal behavior because
      they will be tracked 24 hours a day seven days a week." Wilham's story also

quoted Drake as saying that the GPS bracelets were "placed on the most violent offenders." *Albuquerque Journal, 2-9-2006.*

27. In view of this public policy stated by the NMCD, Mr. Neely expressed reluctance to wear the GPS device, and for a variety of reasons questioned its appropriateness. First, Mr. Neely questioned its appropriateness because this condition was not ordered by the Arkansas Court. Second, Mr. Neely has no history of violence, and the underlying offense was non-violent. Third, because the offense involved only the use of the telephone.

28. After receiving the phone call from PPO Hankins, Mr. Neely's New Mexico counsel contacted Nick D'Angelo, then general counsel to the NMCD regarding the GPS requirement.

29. D'Angelo promised to look into the situation, and stated that there would be no sanctions imposed while he contacted the field office in Albuquerque to investigate the matter.

30. On October 25, 2005, Mr. Neely received a subsequent phone call from PPO Hankins advising him that he must wear the GPS monitor.

31. In spite of Mr. Neely's opposition to this newly added condition of probation, Mr. Neely accepted the GPS tracking device on October 25, 2005, rather than facing arrest for refusal to obey an order from his PPO.

32. The NMCD ignored the ICAOS's procedure for adding "special conditions" of probation. Rule 4.103 of the ICAOS states in pertinent part:

7

(a)     "At the time of acceptance or during the term of supervision, the compact administrator or supervising authority in the receiving state may impose a special condition on an offender transferred under the interstate compact if that special condition would have been imposed on the offender if sentence had been imposed in the receiving state [; and]

(b)     A receiving state shall notify a sending state that it intends to impose or has imposed a special condition on the offender, the nature of the special condition, and the purpose."

33.   Despite the fact that the NMCD did not follow the process mandated by Rule 4.103 for adding special conditions, and the fact Mr. Neely's complied with GPS monitoring, Chel Hechter and other NMCD officials communicated to Arkansas authorities that Mr. Neely refused the GPS monitor.

34.   The New Mexico Corrections Department also violated ICAOS Rule 4.101 which states that:

"A receiving state shall supervise an offender transferred under the interstate compact in a manner determined by the receiving state and consistent with the supervision of other similar offenders sentenced in the receiving state."

35.   Upon information and belief, there is no other example of a case where an individual sentenced for a similar offense by a New Mexico Court, was ever subjected to such onerous conditions as those imposed upon Mr. Neely.

36.   Mr. Neely can cite examples of individuals with extremely violent criminal histories who were not required to wear a GPS monitoring system during the same period of time when this requirement was imposed upon Mr. Neely.

37.   One such example is Michael Paul Astorga.  Mr. Astorga was supervised in Region II Special Programs during the same timeframe as Mr. Neely, yet no GPS requirement was imposed on him.

38. In response to a letter from Mr. Neely's counsel, the New Mexico Department of Public Safety issued a letter on November 28, 2005, advising Mr. Neely that he *was not* required to register as a sex offender pursuant to the New Mexico Sex Offender Registration Act, 29-11A-3 NMSA.

39. The Department of Public Safety also sent a copy of the letter to the Bernalillo County Sheriff's Department.

40. Upon information and belief, the Bernalillo County Sheriff's Department contacted the news media and provided KRQE TV 13 a copy of the DPS letter addressed to Mr. Neely.

41. KRQE's lead story on December 1, 2005, was that Mr. Neely had fought a battle regarding registration and won.

42. Sheriff White, a former crime reporter for TV 13, and former Cabinet Secretary of the New Mexico Department of Public Safety, was interviewed by KRQE for their news story.

43. During the interview, White expressed "shock" and made some inflammatory remarks regarding the DPS and Mr. Neely.

44. Also, during the interview, White stated he intended to challenge the DPS determination regarding Mr. Neely.

45. As a result of the ensuing media frenzy instigated by White, the DPS retreated from their original letter, and issued a subsequent letter to Mr. Neely dated December 7, 2005, stating he was required to register.

46.  The letter was personally signed by John Denko, the Cabinet Secretary of the New Mexico Department of Public Safety.  Mr. Denko stated that the "previous letter was sent erroneously."

47.  Denko sent this letter despite the undisputed fact that section § 29-11A-3 NMSA defines who is a "Sex Offender" and § 29-11A-3(E) NMSA lists the various sex offenses requiring registration pursuant to the Act.  In order for a person to be subject to New Mexico's registration requirements, there must be a conviction for an offense on the list of registerable offenses, or the out-of-state conviction must be "equivalent" to one of New Mexico's registerable offenses.

48.  In the second letter, the DPS did not cite which "equivalent" offense triggered the revised letter sent to Mr. Neely, and their determination that he must register.  All registerable offenses in New Mexico involve pornographic depictions of a minor or direct physical or proximate contact with a victim.

49.  As a result of Denko and the DPS's actions, Mr. Neely continues to be subjected to the registration and all the restrictions placed upon sex offenders.

50.  On November 30, 2005, one day prior to KRQE's lead story, PPO Hankins summoned Mr. Neely to the probation office for a meeting.

51.  During that meeting, SOU supervisor, Chel Hechter, ordered Mr. Neely to vacate his home at 3015 Mountain Road NW, Space 4, no later than 6:00 p.m. that same day, and indicated that failure to do so would result in Mr. Neely's arrest.

52. The reason given by Mr. Hechter when ordering Mr. Neely to vacate his residence, was that the dwelling was located within 1,000 feet of Reginald Chavez Elementary School.

53. Upon information and belief, Mr. Neely alleges that the real motivation for the order was that Hechter and other NMCD officials had been alerted in advance of KRQE's planned story.

54. NMCD officials did not want any television footage showing Mr. Neely, a high-profile monster they themselves had helped create in the media, shown living nearby Reginald Chavez School.

55. At the time Hechter ordered Mr. Neely to vacate his residence, the NMCD website contained no reference to this policy.  Despite repeated requests by Mr. Neely to obtain a copy of this policy, the NMCD refused to produce a copy of the purported policy.

56. Mr. Neely's alleges that Hechter's directive to vacate his home with less than eight hours' notice constituted an unlawful order, and no such policy existed at the time of Hechter's order, however, Mr. Neely did comply with the order rather than facing arrest.

57. Despite of the fact Mr. Neely complied with what he believed was an unlawful order, and despite the lack of any existing written policy, Chel Hechter caused a report to be sent to Arkansas authorities stating that Mr. Neely was in violation of NMCD's "policy" of living within 1000 feet of a school.

58.     The NMCD amended its policies on 11-07-2007, adding a provision of a 1,000
        foot residency restriction.

59.     The NMCD's revised policy now prohibits sex offenders from, "living within
        1,000 feet of an area where children may frequent such as a school, daycare and
        or community center."

60.     The NMCD applies this policy to any person supervised in the SOU, regardless of
        whether or not that person is required to register as a sex offender.

61.     In January 2006, Mr. Neely was notified by PPO Hankins that he had been
        scheduled for a polygraph examination which Mr. Neely was required to take.

62.     The purported reason for the polygraph as stated by PPO Hankins was for
        "treatment purposes."

63.     The examination was administered by Ralph Trotter pursuant to a contractual
        arrangement with the state of New Mexico, and the test was administered at the
        SOU offices located at 111 Gold Avenue SE, Albuquerque, New Mexico.

64.     Mr. Trotter required that Mr. Neely sign a consent to be tested, and a release of
        the results to both the New Mexico Corrections Department and Behavior
        Interventions (BI).

65.     At that time of Mr. Neely's polygraph examination, BI was providing counseling
        under a contractual arrangement with the NMCD.

66.     In early March 2006, PPO Hankins informed Mr. Neely that the Bernalillo
        County Sheriff Department's psychologist and Detective Joseph wished to
        interview him.

12

67.  PPO Hankins indicated that the reason for the interview was because Mr. Neely had "reacted" on some of the polygraph questions.

68.  Because the purported reason for the requested interview was his reaction on the polygraph examination, it certainly appeared to Mr. Neely that the NMCD had released the results of his forced polygraph examination to the Bernalillo County Sheriff's Department.

69.  This release occurred without Mr. Neely's authorization, and the release was contrary to section 1177(a) of the federal Health Insurance Portability and Accountability Act (HIPAA).

70.  Mr. Neely asked PPO Hankins if the interview was voluntary.  PPO Hankins replied that the interview was voluntary.  Mr. Neely further inquired if there would be any retaliation if he declined.  PPO Hankins indicated there would not.

71.  Based on PPO Hankins' representations, Mr. Neely declined to be interviewed by Detective Joseph and the Sheriff Department's psychologist.

72.  Again, in early April 2006, PPO Hankins contacted Mr. Neely and informed him that Detective Joseph was insisting that he must be interviewed.

73.  Mr. Neely communicated to PPO Hankins he was unaware of any legal authority for the Sheriff's Department to conduct such interviews, and again declined to be interviewed by the Bernalillo County Sheriff's Department.

74.  To address his concerns, Mr. Neely requested a meeting with the SOU supervisor.

75.  On April 19, 2006, a meeting was held.  David Jablonski, then Region II Manager (Special Programs), Chel Hechter, then SOU supervisor, Danny Joseph,

13

Bernalillo County Sheriff's Department, Mr. Neely, and Mr. Neely's New Mexico counsel attended the meeting.

76. The meeting was very contentious from the beginning, but the essence of the meeting as communicated by Mr. Hechter, was that Mr. Neely had "failed" his polygraph examination, and that he must fully cooperate with the Sheriff's interview.

77. Mr. Hechter continued in that meeting to state that if Mr. Neely did not like the way he was being treated, he should go live in Arkansas.

78. Based on Detective Joseph's behavior at the meeting, and that Sheriff White had created such an uproar regarding whether or not Mr. Neely was required to register, Mr. Neely would not agree to be interviewed by the Bernalillo County Sheriff's Department.

79. On July 13, 2007, Detective Amy Dudewicz of the Bernalillo County Sheriff's Department was quoted in an Albuquerque Tribune story. Detective Dudewicz stated, "Registered sex offenders are interviewed by the county's behavioral sciences unit which produces a risk assessment on each individual."

80. Detective Dudewicz did not mention by what authority these "risk assessments" are conducted since no risk assessment process has been authorized by the New Mexico Legislature.

81. The Bernalillo County Sheriff's Department does not disclose the process, the evaluation instrument utilized, nor does it provide a registrant any appeal process for its determination of risk.

14

82.   Absent statutory authority from the New Mexico Legislature, Mr. Neely believes that the Bernalillo County Sheriff's Department "risk assessment" of him to be outside the scope of their authority, and contrary to state law.

83.   Forensic Behavioral Health Associates (FBHA) began providing evaluation and counseling services to the New Mexico Corrections Department in March of 2006.

84.   In May of 2006, Mr. Neely was scheduled for an "intake appointment" with Mr. Carlton Lewis, a therapist with FBHA.

85.   Mr. Lewis presented Mr. Neely some forms and requested his signature. One of the forms was an unrestricted Release of Information.

86.   Mr. Neely expressed his reluctance to sign the documents, particularly the unrestricted release, and requested an appointment with the clinical director.

87.   On May 17, 2006, Mr. Neely met with Dr. Troy J. Rodgers at the counseling offices located in the New Mexico Department of Corrections building, 111 Gold SE, Albuquerque, New Mexico.

88.   Dr. Rodgers and Mr. Neely discussed HIPPA issues, and Mr. Neely indicated he was more comfortable with a limited release similar to those used by other correctional authorities. Mr. Neely suggested that the release be limited to attendance, level of participation, and the motivation to benefit from treatment.

89.   Dr. Rodgers was nonnegotiable regarding the release, and indicated that the document is the same as that required for other FBHA clients, and is consistent with his other state contracts.

15

90.     When pressed further on the issue, Dr. Rodgers informed Mr. Neely he could either sign the documents or be terminated from FBHA's program.

91.     Mr. Neely asked what "termination" meant.  Dr. Rogers indicated that it would be considered a violation of probation.

92.     Throughout the duration of Mr. Neely's supervision, FBHA staff met regularly with New Mexico Corrections Department authorities, and Sherriff's Department personnel to discuss Mr. Neely's treatment, and his "risk" to the community.

93.     FBHA was able to justify its violation of HIPPA because of the unrestricted release of information obtained by compulsion.

94.     Subsequent to being released from supervision, Mr. Neely learned that Dr. Rogers is a consultant to the Bernalillo County Sheriff's Department's, Behavioral Sciences Unit, the unit that performs the "risk assessments."

95.     Dr. Rogers and FBHA regularly provided his confidential  information collected via the compulsory authorization to the Bernalillo County Sheriff's Department.

96.     Dr. Rogers and FBHA certainly had an economic incentive to cooperate with the Sheriff Department's "risk assessment" scheme since Dr. Rogers has a contract with both the New Mexico Corrections Department, and the Bernalillo County Sheriff's Department.

97.     In May 2006, after living for seven months under effective home detention with GPS monitoring, Mr. Neely believed that his many of his constitutional rights were being violated.

98.   Mr. Neely requested permission to travel to Arkansas to discuss the situation with his Arkansas counsel. PPO Hankins required that Mr. Neely submit the travel request in writing indicating the purpose and duration of the travel.

99.   Mr. Neely submitted his written request to PPO Hankins on May 31, 2006, and Arkansas Attorney John Collins confirmed Mr. Neely's travel plans with a letter faxed to PPO Hankins.

100.  The NMCD issued a travel permit authorizing Mr. Neely to travel to Arkansas departing New Mexico on June 3, 2006, and returning from Arkansas no later than June 10, 2006, with instructions to contact PPO Hankins upon his return to New Mexico.

101.  On June 13, 2006, in the first meeting following his return from Arkansas, Mr. Neely informed PPO Hankins that based on his conversations with his Arkansas counsel, he intended to undertake legal action challenging his original conviction, and New Mexico's improperly imposed special conditions of probation.

102.  On June 15, 2006, two days after making those comments to PPO Hankins, Detective Joseph appeared at Mr. Neely's place of employment at 1420 Carlisle Blvd NE, Suites 207 & 208 in Albuquerque with a New Mexico arrest warrant.

103.  Detective Joseph alleged and swore under oath that Mr. Neely had violated New Mexico's Sex Offender Registration Act by failing to notify the Sheriff's Department that he was working at 1420 Carlisle Blvd NE, Suites 207 & 208 in Albuquerque.

104.   In seeking the $20,000 arrest warrant, Detective Joseph stated in his Affidavit, "On June 15, 2006, Affiant met with Probation Office (sic) Rosalind Hankins in order to review case files on Mr. Neely.  During this standard review of Mr. Neely files the issued (sic) of Mr. Neely's employment came to light…"

105.   Detective Joseph misled the Court by omitting the following relevant information:

   A.   That on February 24, 2006, a Bernalillo County Sheriff's deputy had actually met with Mr. Neely at his place of employment;

   B.   That his employer had signed an acknowledgment letter regarding Mr. Neely's employment to the NMCD on October 2, 2005; and

   C.   That the Sheriff's Department and the NMCD have a Memorandum of Understanding (MOU) whereby both agencies share their respective files.

106.   As Mr. Neely was being escorted from his office in handcuffs, his employer reassured him bond would be posted as soon as possible.

107.   Rather than transporting Mr. Neely directly to jail, Detective Joseph and Detective Kennedy first transported Mr. Neely to the Probation Office at 111 Gold SE, Albuquerque, New Mexico.

108.   Detective Joseph was unable to make contact with PPO Hankins so he spoke with PPO Liz Foley.  During that conversation with PPO Foley, Detective Joseph requested a probation violation (PV) no-bond "hold", and further informed PPO Foley that Mr. Neely would "bond out right away" without the PV "hold."

109.   PPO Foley did issue the PV "hold" for Mr. Neely as a result of Detective Joseph's request.

110.   Mr. Neely believes this request by Detective Joseph is clear evidence of collusion between the New Mexico Corrections Department and the Sheriff's Department, and their intention to prolong his incarceration for as long as possible.

111.   A probation "hold" makes it impossible for an individual to post bond and be released from custody.

112.   Upon hearing of the no-bond "hold", Mr. Neely's employer went to the Bernalillo County Courthouse and spoke with state District Judge James F. Blackmer, who read the Affidavit for the arrest warrant, heard from the employer, spoke with an Assistant District Attorney, and immediately ordered Mr. Neely released to the custody of Pre-Trial Services.

113.   The following day, June 16, 2006, Mr. Neely made his first appearance in Bernalillo County Metropolitan Court.  Upon review of the complaint, and hearing the State's arguments, Judge Theresa Gomez dismissed the violation of sex offender registration case finding "no probable cause."

114.   As a result of the Sherriff Department's charges, and the NMCD's previous false reports of probation violations sent to the state of Arkansas, the Arkansas Prosecuting Attorney filed a *Petition To Revoke Probation* on June 29, 2006.

115.   In that Petition, it was alleged that:

   A.   "Defendant has refused to wear a GPS device as required by the New Mexico Probation Department."

   B.   "Defendant violated the condition of living within 1,000 feet of a school." and

   C.   "Defendant failed to cooperate with his supervising officer by trying to fight his sex offender supervision."

116. Clearly, the first two allegations were untrue, and the NMCD knew they were untrue at the time the *Petition To Revoke* was filed.

117. The third allegation was never explained to Mr. Neely, and was so vague that Mr. Neely to this day does not know what was meant by the allegation, "Defendant failed to cooperate with his supervising officer by trying to fight his sex offender supervision."

118. Mr. Neely believes that the allegation was retaliatory and a direct result of him expressing opposition to Dr. Rogers regarding the unrestricted release of information, and NMCD's misapplication of its own policies.

119. On June 29, 2006, the Arkansas Court issued an arrest warrant as a result of the *Petition To Revoke*.

120. On the advice of counsel, Mr. Neely immediately traveled directly to Arkansas and surrendered himself on the outstanding warrant.

121. NMCD officials reported this travel to Arkansas as a *violation of probation*, and requested an additional charge of "unauthorized travel" be included as grounds for revocation of his supervision.

122. On July 18, 2006, Undersheriff Sal Baragiola appeared on television implying that Mr. Neely had bonded out of jail and disappeared.

123. The media hyped Mr. Neely's "disappearance" for nearly two days, despite the fact that Mr. Neely communicated to PPO Hankins in writing on July 17, 2006, that he was driving to Arkansas to surrender on the outstanding warrant.

124.  Mr. Neely alleges that the Sheriff's Department instigated the hype regarding Mr. Neely's alleged "disappearance" because they were outraged about Judge Gomez's no probable cause finding,  and dismissal the day following his arrest.

125.  At the time Baragiola went on the air on July 18, 2006, Baragiola knew that there were no criminal charges pending against Mr. Neely in the state of New Mexico because  the Sheriff Department's case had been dismissed on June 15, 2006.

126.  Sheriff's Department officials prevailed upon the District Attorney's Office to resuscitate the allegation of *Violation of Sex Offender Registration.*

127.  The Sheriff Department's case was presented to a Grand Jury on August 15, 2006.

128.  The Grand Jury "No Billed" the cause.

129.  In view of the fact that the Detective Joseph's case against Mr. Neely had been totally discredited, by both a Judge and the Grand Jury, and Mr. Neely had complied with Chel Hechter's order to vacate his home, and was wearing the GPS monitor, Mr. Neely could see no basis or justification for either state to continue pursuing the *Petition To Revoke.*

130.  After the Grand Jury's *No Bill*, John Collins, Mr. Neely's Arkansas counsel, contacted the Lonoke Prosecuting Attorney's Office, and requested that the *Petition To Revoke* be dismissed.

131.  Mr. Collins reported that he was unsuccessful in convincing the Arkansas Prosecuting Attorney's Office to withdraw the *Petition To Revoke.*

132.  According to Mr. Collins, reports from New Mexico indicated that New Mexico officials still had issues with Mr. Neely.  In fact, the Arkansas Prosecuting

Attorney's Office indicated that they intended to call New Mexico witnesses, including the Bernalillo County Sheriff himself.

133. Based on those representations from Mr. Collins, and pursuant to Rule 5.108 of the Interstate Compact For Adult Offender Supervision (ICAOS), Mr. Neely filed a *Demand For A Probable Cause Hearing* to be held in New Mexico.

134. This provision of the ICAOS is intended to prevent an offender from being forced to return to a Sending State (i.e.: Sentencing State), and defend against allegations until a prima facia case has been established in the Receiving State (i.e.: Supervising State).

135. This *Demand For A Probable Cause Hearing* was delivered to the New Mexico Corrections Department's counsel by certified mail.

136. Despite receiving this notice, the New Mexico Corrections Department refused to schedule a Probable Cause Hearing.

137. Mr. Neely was forced to expend considerable financial resources litigating in the Second Judicial District Court attempting to compel the NMCD to conduct a Probable Cause Hearing as required by the ICAOS.

138. Between September 26, 2006, and the dismissal of the *Petition To Revoke* on May 15, 2007, Chel Hechter and the NMCD took no steps to clarify any possible misunderstanding regarding their previously reported violations.  Mr. Neely's case came before the Arkansas Court related to New Mexico's allegations on:

   A. October 10, 2006,

   B. December 4, 2006,

   C. February 13, 2007, and again on

22

D.     February 22, 2007.

139.   Finally, on May 01, 2007, as a result of *Findings* issued by the Second Judicial

District Court, a Probable Cause hearing was held by the NMCD.

140.   The Hearing Officer recommended that the *Petition To Revoke* be withdrawn.

141.   The Arkansas Prosecuting Attorney dismissed the *Petition To Revoke* on May 15,

2007.

142.   Mr. Neely completed the supervised portion of his probation on August 11, 2008,

and he was subsequently granted early termination from probation on February

11, 2009.

## CLAIM I

### CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1983.

(As against Defendants White and Denko in their official and individual capacities
and against Defendants Joseph and Hechter in their individual capacities)

143.   Plaintiff realleges and incorporates paragraphs 1 through 142 herein.

144.   Defendants Darren White, Danny Joseph, John Denko and Chel Hechter are each

persons for purposes of 42 U.S.C. Section 1983.

145.   Defendants Darren White, Danny Joseph, John Denko, Chel Hechter were acting

under color of state law.

146.   Defendants White, Joseph, Denko, and Hechter, each reached an understanding

with one or more of the co-conspirators to accomplish the unlawful purpose of

depriving Mr. Neely of his constitutional rights.

23

147.    The conspiracy was intended to accomplish the revocation of Mr. Neely's
probation and unlawfully deprive Mr. Neely of his liberty and property.

148.    The conspirators acted in collusion with intent to accomplish the following:

A.    To subject Mr. Neely to the New Mexico sex offender registration
requirements, without statutory authority, and contrary to state law;

B.    Defendant Hechter with the intent to convince the Arkansas Prosecuting
Attorney to revoke Mr. Neely's probation caused or permitted false
reports of probation violations to be transmitted.

C.    With intent to bolster the false reports sent by Hechter, Defendants White,
Joseph, and Hechter conspired to prosecute Mr. Neely for violation of
registration requirements.

D.    This prosecution was initiated maliciously because of the fact all of the
Defendants knew Mr. Neely was both registered and fully compliant; and

E.    With intent to keep the probation revocation process going, Defendants
White, Joseph, and Hechter intentionally misrepresented to Arkansas
authorities that the there was a pending felony charge, and the previously-
submitted false reports of probation violations constituted grounds for
revocation.

149.    As a direct and foreseeable consequence of the conspiracy, Mr. Neely has
suffered substantial legal expenses as he was forced to defend against a meritless
criminal prosecution in the state of New Mexico, and a meritless *Petition To
Revoke* in the state of Arkansas.

24

## CLAIM II

## MALICIOUS PROSECUTION IN VIOLATION OF 42 U.S.C. § 1983

(As against Defendant White in his individual and official capacities
and against Defendant Joseph in his individual capacity)

150.    Plaintiff realleges and incorporates paragraphs 1 through 149 herein.

151.    Defendants Darren White and Danny Joseph are each persons for purposes of 42

U.S.C. Section 1983.

152.    Defendants Darren White and Danny Joseph were acting under color of state law

when they acted to by virtue of their authority as Sheriff and Deputy Sheriff.

153.    Defendant Darren White is the Sheriff of Bernalillo County and is the final

policymaker for the Department.

154.    Defendants White and Joseph commenced a criminal proceeding against Mr.

Neely, to wit:  On June 15, 2006, Detective Joseph authored an Affidavit for Mr.

Neely's arrest omitting relevant facts, thus misleading the Court.

155.    Defendant's White and Joseph continued and vigorously pursued their case,

despite the fact District Judge James Blackmer found the case to be extremely

weak and ordered Mr. Neely's release.  Also, the case was dismissed by a

Bernalillo County Metropolitan Judge having found the allegation to be lacking

probable cause.

156.    The criminal proceedings ultimately terminated in Mr. Neely's favor when a

Bernalillo County Grand Jury "No Billed" the cause.

25

157.   Defendants White and Joseph pursued the charges against Mr. Neely out of malice.

158.   The criminal proceedings against Mr. Neely resulted in a deprivation of Mr. Neely's liberty, to wit:  Mr. Neely was ordered to comply with conditions of release by the District Court, and forced to remain under GPS monitoring, and enhanced supervision for an extended period of time.

159.   As a direct and foreseeable consequence of the deprivations, Mr. Neely has suffered substantial legal expenses as he was forced to defend against a meritless prosecution in the state of New Mexico, and extreme emotional stress as a result of the media circus created by Defendant's malicious allegations.

## CLAIM III

## RETALIATION AND DEPRIVATION OF CONSTITUTIONAL RIGHT TO FREE SPEECH IN VIOLATION OF 42 U.S.C. § 1983

(As against Defendant White in his individual and official capacities and against Defendants Joseph, Rogers, and Hechter in their individual capacities)

160.   Plaintiff realleges and incorporates paragraphs 1 through 159 herein.

161.   Defendants Darren White, Danny Joseph, Troy Rodgers, and Chel Hechter are each persons for purposes of 42 U.S.C. Section 1983.

162.   Defendants Darren White, Danny Joseph, Troy Rodgers and Chel Hechter were acting under color of state law when they acted to retaliate by virtue of their authority as Sheriff, Deputy Sheriff, supervisor of the Sex Offender Unit, and clinical director of Forensic Behavioral Health Associates.

26

163.    Plaintiff had had a clearly established constitutional Freedom of Speech right to voice his opposition to the acts, commands, and policies of the Defendants.

164.    Defendants Chel Hechter and Danny Joseph orchestrated an arrest in retaliation for Mr. Neely's statement to his supervising probation officer two days after he returned from Arkansas that he intended to mount a legal challenge to the improperly imposed conditions of probation.

165.    This arrest occurred only 29 days after Mr. Neely had met with Dr. Rodgers on May 17, 2006, regarding the appropriateness of the unrestricted release of information.

166.    On June 29, 2006, based on Defendants Hechter, Joseph, and Rodgers' retaliatory actions, the Arkansas Prosecuting Attorney filed a *Petition To Revoke* Mr. Neely's supervision.

167.    As a direct and foreseeable consequence of the Defendants retaliatory actions, Mr. Neely incurred substantial legal expenses as he was forced to defend against a meritless *Petition To Revoke* in the state of Arkansas, and extreme emotional stress as a result of the Defendants' retaliation.

## CLAIM IV

## DEPRIVATION OF DUE PROCESS IN VIOLATION OF 42 U.S.C. § 1983

(As against Defendant Williams in his individual and official capacities and against Defendant Hechter in his individual capacity)

168.    Plaintiff realleges and incorporates paragraphs 1 through 167 herein.

169. Defendants Joe Williams and Chel Hechter are each persons for purposes of 42 U.S.C. Section 1983.

170. Defendants Joe Williams and Chel Hechter were acting under color of state law.

171. The Fourteenth Amendment to the United States Constitution provides a clearly established right to due process.

172. Defendant Joe Williams is the Cabinet Secretary of the New Mexico Department of Corrections, and is the final policy-maker for the NMCD.

173. On September 26, 2006, Mr. Neely filed a *Demand For a Probable Cause Hearing* in the Second Judicial District Court.

174. Both ICAOS rules and NMCD policy mandate a probable cause hearing in the receiving state.

175. NMCD policy CD 051201 states in part, "No waiver of a probable cause hearing shall be accepted unless accompanied by an admission to one or more significant violations of the terms or conditions of supervision..." The policy further states "All requests will be honored by the receiving state."

176. The trigger for this due process requirement is that a revocation is pending, an offender refuses to admit to at least one of the allegations, and the offender is potentially facing loss of liberty in the sending state.

177. Despite this unambiguous NMCD policy and the requirements of the ICAOS, Defendants Williams and Hechter refused to schedule a probable cause hearing.

178. Mr. Neely was forced to litigate in the Second Judicial Court to forcibly obtain a probable cause hearing as required by the ICAOS.

28

179.   As a direct and foreseeable result of Defendants' actions, Mr. Neely incurred

substantial legal expenses litigating this issue.

180.   The Second Judicial District Court agreed with Mr. Neely and issued *Findings*

affirming his right to a probable cause hearing in New Mexico.

181.   The ensuing hearing resulted in a recommendation to the Arkansas Prosecuting

Attorney that the *Petition To Revoke* be withdrawn.

## CLAIM V

## DEPRIVATION OF CONSTITUTIONAL RIGHT TO PETITION FOR REDRESS OF GRIEVANCES IN VIOLATION OF 42 U.S.C. § 1983

(As against Defendant White in his individual and official capacities and against
Defendants Joseph and Hechter in their individual capacities)

182.   Plaintiff realleges and incorporates paragraphs 1 through 181 herein.

183.   Defendants Darren White, Danny Joseph, and Chel Hechter are each persons for

purposes of 42 U.S.C. Section 1983.

184.   Defendants Darren White, Danny Joseph, and Chel Hechter were acting under

color of state law when they acted to retaliate by virtue of their authority as

Sheriff, Deputy Sheriff and supervisor of the Sex Offender Unit.

185.   Plaintiff had a clearly established constitutional right to Petition for Redress of

Grievances.

186.   On June 15, 2006, within days of Mr. Neely's return from Arkansas, Defendants

Chel Hechter and Danny Joseph orchestrated an arrest in retaliation for Mr.

Neely's statement to his supervising probation officer that he intended to mount a legal challenge to the improperly imposed conditions of probation.

187.    On June 29, 2006, based on Defendants Hechter and Joseph's retaliatory actions, the Arkansas Prosecuting Attorney filed a *Petition To Revoke* Mr. Neely's supervision.

188.    As a direct and foreseeable consequence of the Defendants retaliatory actions, Mr. Neely incurred substantial legal expenses as he was forced to defend against a meritless *Petition To Revoke* in the state of Arkansas, and extreme emotional stress as a result of the Defendants' retaliation.

## CLAIM VI

## DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS IN VIOLATION OF 42 U.S.C. § 1983

(As against Defendant Hechter in his individual capacity)

189.    Plaintiff realleges the allegations contained in paragraphs 1 through 188 herein.

190.    Defendant Chel Hechter is a person for purposes of 42 U.S.C. Section 1983.

191.    Defendant Chel Hechter were acting under color of state law as supervisor of the sex offender unit when he issued Mr. Neely the order to vacate his residence.

192.    Clearly, Mr. Neely had an established constitutional right, under the Fourteenth Amendment, to his property and to due process before being deprived of the use of that property.

193.   Defendant Hechter acted contrary to the NMCD's policy and with deliberate

indifference to Mr. Neely's property rights.

194.   As a direct and foreseeable consequence to Defendant Hechter's actions, Mr.

Neely suffered extreme financial hardship as he was forced to pay for temporary

lodging while simultaneously paying for the residence he was forced to vacate.

## CLAIM VII

## CONSPIRACY TO DISSEMINATE CONFIDENTIAL MEDICAL RECORDS IN VIOLATION OF 42 U.S.C. § 1983

(As against Defendants White and Williams in their individual and official capacities and against Defendants Joseph, Rogers, and Hechter in their individual capacities)

195.   Plaintiff realleges and incorporates paragraphs 1 through 194 herein.

196.   Defendants Darren White, Joe Williams, Danny Joseph, Troy Rodgers, and Chel

Hechter are each persons for purposes of 42 U.S.C. Section 1983.

197.   Defendants Darren White, Joe Williams, Danny Joseph, Troy Rodgers, and Chel

Hechter were acting under color of state law when they acted to disseminate Mr.

Neely's confidential records under their authority as Sheriff, Cabinet Secretary of

The Department of Corrections, Deputy Sheriff, supervisor of the Sex Offender

Unit, and clinical director of Forensic Behavioral Health Associates.

198.   Mr. Neely had a clear and established right to confidentiality of his medical

records pursuant to HIPPA.  The Defendants compelled Mr. Neely to relinquish

that right under threat of a probation violation.

31

199.    As a direct and foreseeable consequence of the Defendants' actions, Mr. Neely's most private thoughts were routinely disseminated to the Bernalillo County Sheriff's Department to further its unlawful risk assessments.

200.    As a direct result of this unlawful assessment utilizing FBHA's records, and Mr. Neely's refusal to be interviewed by the Bernalillo County Sheriff Department's Behavioral Sciences Unit, the Sheriff's Department has classified Mr. Neely as "high risk" to the community.

201.    The Bernalillo County Sheriff's Department uses this "high risk" label as justification for frequent address verifications on the registrant.

202.    On Halloween night, October 31, 2008, the Sheriff's Department, accompanied by members of the local media, came to Plaintiff's home as they purportedly were checking on "high risk" sex offenders.

## CLAIM VIII

## DECLARATORY RELIEF

203.    Plaintiff realleges and incorporates paragraphs 1 through 202 herein.

204.    Their exists an actual case and controversy among the parties as to the Defendant's assertion and requirement that Plaintiff must register as a sex offender.

205.    The laws of the State of New Mexico do not require registration for the crime of *Sexual Indecency With A Child*. A registration requirement under New Mexico must be for one of the listed sex offenses or an "equivalent" out-of-state conviction.

32

206.  Section § 29-11A-3(E) NMSA lists the various sex offenses requiring registration pursuant to the act.  In order for a person to be subject to New Mexico's registration requirements, there must be a conviction for an offense on the list of registerable offenses, or the out-of-state conviction must be "equivalent" to one of New Mexico's registerable offenses.

207.  There are no "equivalent offenses" in the state of New Mexico.  All registerable offenses in New Mexico involve pornographic depictions of a minor or direct physical or proximate contact with a victim.

208.  Wherefore, the Court should declare the requirement that Plaintiff register as a sex offender is contrary to law and violative of his constitutional rights.

## CLAIM IX

### INJUNCTIVE RELIEF

209.  Plaintiff realleges and incorporates paragraphs 1 through 208 herein.

210.  Mr. Neely continues to suffer ongoing harm in the form the unlawful imposition of registration by the Department of Public Safety for which no remedy at law exists.  Mr. Neely is required to:

    A.    Submit to periodic photographing and fingerprinting by the Bernalillo County Sheriff;

    B.    His registration information is disseminated throughout the community by notification to daycare schools, etc.;

    C.    He is forbidden to use any public library in the City of Albuquerque;

D.      The Bernalillo County Sheriff frequently visits his house conducting address verifications;

E.      He is required to provide the Bernalillo County Sheriff a travel itinerary prior to traveling away from home for more than 10 days; and

F.      He is threatened with felony arrest charges if he fails to perform these acts, despite not having committed a New Mexico registerable offense or its equivalent.

211.    Wherefore, the Court should enjoin the Defendants from requiring the Plaintiff from registering as a sex offender and to remove his name from the list.

**WHEREFORE,** to redress the injuries proximately and directly caused by Defendants' conduct as stated in the foregoing paragraphs, and to prevent the continuation of irreparable harm to Mr. Neely resulting from the policies, customs, practices alleged herein, Plaintiff hereby requests the following relief:

A)      Compensatory damages for constitutional deprivations; past and future economic loss, physical harm, emotional trauma, loss of privacy, and harm to reputation, in amounts to be determined by the jury at trial.

B)      Damages in an amount to be established at trial to exemplify and punish those defendants whose conduct in this matter was malicious, wanton, and/or oppressive;

34

C)   A declaration of the Court that the Defendants' imposition of sex offender

registration and other restrictions on his liberties are violative of his constitutional

rights;

D)   An order enjoining the Defendants from continuing to impose sex offender

registration on Plaintiff and from otherwise impairing his liberty interests,

property rights and other constitutional rights;

E)   An award for reasonable and necessary attorney fees, costs, and interest in pursuit

of this action; and

F)   All other relief the Court may deem just and proper.


Respectfully Submitted,


*Larry Neely*

Larry Neely, Plaintiff
9722 Western Avenue SW
Albuquerque, NM 87121
505 352-8894